**BROSIOUS v. PEPSI-COLA CO. et al.**

No. 856.

District Court, M. D. Pennsylvania.

March 15, 1945.

See, also, 3 F.R.D. 335.

Miller Alanson Johnson, of Lewisburg, Pa., for plaintiff.

Arthur T. Vanderbilt, of Newark, N. J., and Hull, Leiby and Metzger and Walter H. Compton, all of Harrisburg, Pa., for defendant Pepsi-Cola Co.

430

Ritchie, Janney, Ober & Williams, of Baltimore, Md., and Cloyd Steininger, of Lewisburg, Pa., for defendant Cloverdale Spring Co.

WATSON, District Judge.

The plaintiff, William G. Brosious, by this suit seeks recovery of treble damages from the defendants, Pepsi-Cola Company and Cloverdale Spring Company, under the Anti-Trust Act of July 2, 1890, 15 U.S.C.A. §§ 1, 2, 15, on the ground that the defendants, pursuant to an alleged unlawful conspiracy, refused to sell the manufactured products of the Cloverdale bottling plant, which included Pepsi-Cola, to the plaintiff unless he refrain from buying, selling, or handling soft drinks made by independent manufacturers who were competing with the defendants for the trade of the public, and also comply with certain standards set up by the defendants.

The case came on for trial before the court without a jury and, at the conclusion of plaintiff's case, the defendants moved to dismiss the action. This motion is now before the court for disposition.

Findings of Fact.

The Pepsi-Cola Company is the owner of the registered trade name and trade-mark "Pepsi-Cola". By agreement entered into on November 6, 1934, the Pepsi-Cola Company appointed The Cloverdale Spring Company as its exclusive bottler, to bottle and distribute the beverage known as Pepsi-Cola in fourteen counties in Pennsylvania, three counties in West Virginia, two counties in Virginia and one county in Maryland. Under this agreement, The Cloverdale Spring Company agreed, among other things, to operate a clean bottling plant at Newville, Pennsylvania, to make bottled Pepsi-Cola in accordance with the formula set forth in the agreement, to push vigorously the sale of Pepsi-Cola in the territory through jobbers, salesmen and distributors to the satisfaction of Pepsi-Cola Company, to sell Pepsi-Cola only in cases of twenty-four bottles of twelve ounces each at a specified price, and to fix a specified price in the territory for resale to retailers. The Cloverdale Spring Company also agreed not to handle any other beverage with the name Cola, or any beverage which could be confused with Pepsi-Cola. The Pepsi-Cola Company agreed to sell to The Cloverdale Spring Company its requirements of a certain "secret merchandise", which is Pepsi-Cola concentrate, at a specified price.

The Pepsi-Cola Company manufactures the Pepsi-Cola concentrate at its plant at Long Island City, New York. In 1941, the Pepsi-Cola concentrate purchased by The Cloverdale Spring Company was delivered in ten gallon metal containers to truckers at the Pepsi-Cola Company plant at Long Island City, New York, and transported by the truckers to the plant of The Cloverdale Spring Company at Newville, Pennsylvania. The bottled Pepsi-Cola is manufactured by The Cloverdale Spring Company at its Newville plant in accordance with the formula set forth in the agreement with the Pepsi-Cola Company. One part of the concentrate purchased from Pepsi-Cola Company is mixed with four parts of filtered sugar syrup; and two ounces of this completed syrup and ten ounces of carbonated water go into each twelve ounce bottle of Pepsi-Cola.

All bottled Pepsi-Cola sold by The Cloverdale Spring Company to distributors for resale outside of the State of Pennsylvania is sold at the Newville plant to the distributors, who load and transport it on their own trucks.

For a period of about six years prior to April 3, 1941, The Cloverdale Spring Company sold bottled Pepsi-Cola to the plaintiff for cash at its plant at Newville, Pennsylvania, and the plaintiff resold and distributed this Pepsi-Cola within the State of Pennsylvania. The Cloverdale Spring Company discontinued sales of Pepsi-Cola to the plaintiff on or about April 3, 1941, and has sold no Pepsi-Cola to the plaintiff since.

About March 31, 1941, plaintiff was asked by representatives of The Cloverdale Spring Company to enter into a different arrangement for the marketing of Pepsi-Cola. He was asked to take a larger territory, handle Cloverdale products which included Pepsi-Cola exclusively, and paint his truck in accordance with Pepsi-Cola Company's specifications, with no assurance that he could retain the territory so offered. The plaintiff refused to enter into such an arrangement, and The Cloverdale Spring Company refused to sell bottled Pepsi-Cola to him. On or about April 3, 1941, plaintiff went to New York City and interviewed some of the officers and representatives of the Pepsi-Cola Company. He was told by the General Manager of Sales that "it was the policy of the

Pepsi-Cola Company to back up their franchise bottlers, and they would do so in this case." He was also told by some representative of the Pepsi-Cola Company that "it is not our policy to tell our franchised bottlers what to do but, if sales drop off in any particular territory, then we step in." Later, he was informed by letter from the Pepsi-Cola Company dated April 5, 1941, that "there is nothing further we can do for you in regard to the matter we discussed when you were here in this office."

## Discussion.

Sections 1 and 2 of the Sherman Act which the plaintiff contends the defendants violated, provide, in so far as pertinent, as follows:

"1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal; * * *."

"2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor."

Three questions are here presented: (1) Was there a conspiracy between the Cloverdale Spring Company and Pepsi-Cola Company pursuant to which sales of Pepsi-Cola to the plaintiff were discontinued? (2) Were the sales of Pepsi-Cola from The Cloverdale Spring Company to the plaintiff sales in interstate commerce? (3) Was there an unreasonable restraint of interstate commerce proven, or can it be inferred from the evidence?

As to the first question, it is my opinion that the evidence will not support a finding, that a conspiracy existed between The Cloverdale Spring Company and Pepsi-Cola Company pursuant to which sales of Pepsi-Cola to the plaintiff were discontinued. However, as the case will be decided on another point, it may be assumed for the purpose of this discussion that sales of Pepsi-Cola to the plaintiff were discontinued pursuant to the conspiracy between the defendants.

As to the second question, it is contended by the plaintiff that there was a continuous flow of interstate commerce beginning with the shipment of the concentrate from New York and continuing through the sale of the bottled Pepsi-Cola by The Cloverdale Spring Company to the plaintiff and other distributors, so that the sales of Pepsi-Cola to the plaintiff were sales in interstate commerce; but, on the other hand, it is well contended by the defendants that the bottled Pepsi-Cola was created in Pennsylvania and sold only in Pennsylvania by the plaintiff, thereby causing it to become "intrastate commerce". Under the recent cases, the change of the Pepsi-Cola concentrate into bottled Pepsi-Cola might be termed a "temporary rest" or "stoppage" only, or as an intrastate sale directly affecting interstate commerce; thus, putting the finished bottled product in the "stream" of interstate commerce and thereby subjecting the case at bar to the jurisdiction of the Act. For the purpose of this discussion, it may also be assumed that the sales of Pepsi-Cola from The Cloverdale Spring Company to the plaintiff were sales in interstate commerce.

The remaining, and important, question is, Was there an unreasonable restraint of interstate commerce proven, or can it be inferred from the evidence? If this question is answered in the negative, the action must be dismissed.

In Trenton Potteries Co. v. United States, 2 Cir., 300 F. 550, 553, Judge Hough, in defining restraint of trade, quotes Justice Holmes (Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232) "'only such contracts and combinations are within the act as by reason of intent or the inherent nature of the contemplated acts prejudice the public interests by unduly restricting competition and unduly obstructing the course of trade.'" The right of each competitor to fix the price of the commodities which he offers for sale, and to dictate the terms upon which he will dispose of them, is indispensable to the very existence of competition. If that right is to be forbidden competition is not only restricted but destroyed.

The Supreme Court said in Apex Hosiery Co. v. Leader, 310 U.S. 469, 500, 60 S.Ct. 982, 996, 84 L.Ed. 1311, 128 A.L.R. 1044, "In the cases considered by this Court since the Standard Oil case [Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734] in 1911 some form of restraint of commercial competition has been the sine qua non to the condemnation of contracts, combinations or conspiracies under the Sherman Act, and

in general restraints upon competition have been condemned only when their purpose or effect was to raise or fix the market price. It is in this sense that it is said that the restraints, actual or intended, prohibited by the Sherman Act are only those which are so substantial as to affect market prices. Restraints on competition or on the course of trade in the merchandising of articles moving in interstate commerce is not enough, unless the restraint is shown to have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition."

There is no evidence that the purpose or effect of the alleged agreement in this case was to raise or affect the market price or to affect in any way the conditions under which Pepsi-Cola could be purchased by retailers or by the public.

The alleged agreement between the defendants, if one existed relative to the sale of the bottled product, is readily distinguishable from agreements unreasonably restraining interstate commerce in violation of Section 1 of the Sherman Act, such as agreements between competitors to enforce price or other restrictions, and agreements between manufacturers and wholesalers or retailers under which the manufacturer attempts to control the price and conditions of resales to retailers and to the public. Such agreements have been held unreasonably to restrain interstate commerce in violation of the Sherman Act, since the necessary result of such agreements is to increase prices, lessen competition and reduce sales, thereby restraining and reducing interstate commerce in the product or article involved. Here, an entirely different situation is presented as the agreement is not for the purpose of maintaining prices or otherwise restricting the conditions of sales to retailers or to the public, but solely for the purpose of increasing such sales; it is a "vertical" agreement between the defendants, descending from the manufacturers of the concentrate through the bottler to the distributor and is in no way similar to a situation such as existed in Johnson v. Joseph Schlitz Brewing Company, D.C., 33 F.Supp. 176, where three of the largest brewers of beer allegedly entered into a conspiracy whereby each of the three agreed to refrain from selling draft beer to the exclusive draft beer accounts of either of the other parties to the conspiracy. There the agreement was a "horizontal" one, existing between parties clearly in direct competition with each other, and just as clearly with the result of restraining such competition.

Now, there has never been any competition, actual or possible, between Pepsi-Cola Company and The Cloverdale Spring Company; and hence, no competition between them can be restrained by their combination to conduct the trade of The Cloverdale Spring Company, though the complaint indicates that the action is based upon the existence of a conspiracy between the defendants to monopolize and restrain interstate commerce in Pepsi-Cola "syrup" and bottled Pepsi-Cola. The contract, combination, or conspiracy charged against them did not restrict competition between The Cloverdale Spring Company and Pepsi-Cola Company on the one side and the independent manufacturers or dealers who were their competitors on the other side, because it left the latter free to select their purchasers and to fix the prices of their goods and the terms at which they would dispose of them.

The Cloverdale Spring Company and its competitors were not dealing in articles of prime necessity, like coal or wheat, nor were they rendering public or quasi public service, like railroad and gas corporations. Each of them had the right to refuse to sell its commodities at any price. Each had the right to fix the prices at which it would dispose of them, and the terms upon which it would contract to sell them. Each of them had the right to determine with what persons it would make its contracts of sale. "The exercise of these undoubted rights is essential to the very existence of free competition, and so long as their exercise by any person or corporation in no way deprives competitors of the same rights, or restricts them in the use of these rights, it is difficult to perceive how their exercise can constitute any restriction upon competition or any restraint upon interstate trade." Whitwell v. Continental Tobacco Co., 8 Cir., 125 F. 454, 461, 64 L.R.A. 689.

The acts of the defendant, which are alleged by the complaint to constitute an unlawful restraint upon interstate commerce are nothing more than the lawful exercise of these unquestioned rights which are indispensable to the existence of competition or to the conduct of trade. The Cloverdale Spring Company's outlet of soft drinks fixed conditions of sale to the plaintiff,

namely: that he accept certain territory "three counties more" than he was handling at the time, which does not seem an unreasonable restraint of trade; that he paint his trucks the color specified by the bottler; and that he handle all the bottled products of The Cloverdale Spring Company only, one of which was Pepsi-Cola. This was no restriction upon free competition, because it left the rivals of The Cloverdale Spring Company free to sell their competing commodities at any price they elected to charge for them. It would have been no violation of the law under consideration if The Cloverdale Spring Company and Pepsi-Cola Company had combined to refuse to sell any of their commodities at any price, and to retire entirely from the business in which they were engaged.

In Whitwell v. Continental Tobacco Co., supra, the Tobacco Company and its employee sold its product to customers who refrained from dealing in the goods of its competitors at prices which rendered such purchases profitable. To those who did not refrain from doing so, however, the company fixed the prices of its goods so high that their purchase was unprofitable. The court held that the restriction of their own trade in this manner by the defendants to those purchasers who declined to deal in the goods of their competitors was not violative of the Anti-Trust Act.

There is no restriction upon competition here, because this refusal on the part of The Cloverdale Spring Company to sell to the plaintiff left the rivals of The Cloverdale Spring Company free to sell their competing commodities to all other purchasers than those who bought of The Cloverdale Spring Company and free to compete for sales to the customers of The Cloverdale Spring Company by offering to them goods at lower prices or on even better terms than they secured from The Cloverdale Spring Company.

■ Nor did defendants violate Section 2 of the Anti-Trust Act, 15 U.S.C.A. § 2. The Supreme Court has declared that the Act must have a reasonable construction. Hopkins v. United States, 171 U.S. 578, 600, 19 S.Ct. 40, 43 L.Ed. 290; United States v. Joint Traffic Ass'n, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259. The purpose of the second section is the same as that of the first—to prevent the restriction of competition—and the two sections ought to receive similar interpretations. The Supreme Court has declared that to be brought within the Act the "conspiracy's" necessary effect must be to restrict directly and substantially competition in commerce among the states. Similarly to show monopoly a direct and substantial restriction on commerce among the states must be shown. Such restriction has not been shown here. "An attempt to monopolize a part of interstate commerce which promotes, or but indirectly or incidentally restricts, competition therein, while its main purpose and chief effect are to increase the trade and foster the business of those who make it, was not intended to be made, and was not made, illegal by the second section of the act under consideration, because such attempts are indispensable to the existence of any competition in commerce among the states." Whitwell v. Continental Tobacco Co., supra.

■ My conclusion is that there was not an unreasonable restraint of interstate commerce proven, nor can it be inferred from the evidence, and this action should be dismissed.

Conclusions of Law.

1. Restraints, actual or intended, prohibited by the Sherman Act, are only those which are so substantial as to affect market prices.

2. Restraints on competition or on the course of trade in the merchandising of articles moving in interstate commerce is not enough unless the restraint is shown to have, or is intended to have, an effect upon prices in the market, or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition.

3. Plaintiff has failed to sustain his burden of proof that defendants' actions were in restraint of interstate trade or effected a monopoly which was in restraint of trade.

4. The motion to dismiss the action must be granted.