McELHENNEY CO., Inc., W. F. Snipes, George Toole, Mac Toole, R. P. Swofford, Charles L. Gasque and Harry Clinkscales, Appellants,

v.

WESTERN AUTO SUPPLY COMPANY, Appellee.

No. 7813.

United States Court of Appeals Fourth Circuit.

Argued March 18, 1959.

Decided July 16, 1959.

Chester D. Ward, Jr., Spartanburg, S. C., for appellants.

James C. Wilson, Kansas City, Mo., and Alfred F. Burgess, Greenville, S. C. (Carl E. Enggas, Colvin A. Peterson, Jr., Kansas City, Mo., Wyche, Burgess & Wyche, Greenville, S. C., and Watson, Ess, Marshall & Enggas, Kansas City, Mo., on the brief), for appellee.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOBELOFF, Chief Judge.

A suit claiming various sums aggregating $2,241,000 as treble damages was brought against the Western Auto Supply Company charging it with having violated Section 3 of the Clayton Act,[1] 15 U.S.C.A. § 14, and Section 2 of the Sherman Act,[2] 15 U.S.C.A. § 2.

The five individual plaintiffs are the owners of five stores in South Carolina and one in Georgia which in the past served as retail outlets for Western Auto merchandise, and the sixth plaintiff, Mc-Elhenney Co., Inc., is the former South Carolina distributor for Sylvania television sets who from time to time had made sales to the plaintiff-retailers. Western Auto is a nationwide distributor of products for automobile and home. Among the items which it sells are sport-

---

1. Section 3 of the Clayton Act.

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or

such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." Oct. 15, 1914, c. 323, § 3, 38 Stat. 731.

2. Section 2 of the Sherman Act.

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." July 2, 1890, c. 647, § 2, 26 Stat. 209. As amended July 7, 1955, c. 281, 69 Stat. 282.

ing goods, toys, electrical appliances, power and hand tools, lawn and garden equipment, radio and television sets, and, as its name suggests, automobile supplies.

The amended complaint is quite long, containing over one hundred numbered paragraphs, dealing with defendant's actions in regard to each of the six plaintiffs. In essence, they allege that during varying periods prior to 1956 Western Auto threatened to stop selling to the plaintiff-retailers if they would continue to handle goods in competition with Western Auto lines, and that ultimately Western Auto carried out this threat and discontinued doing business with the plaintiff-retailers who did not abide by the defendant's wishes.

■ The District Court entered an order sustaining Western Auto's motion to dismiss on the ground that the amended complaint failed to state a claim for which relief could be granted. This is an appeal from that order.[3]

Instead of making its merchandise available through a larger number of its own retail stores, or in hardware stores generally, Western Auto has in practice restricted its outlets to a network of some 350 company-owned stores and approximately 3,600 independently owned and operated "associate" stores. The company-owned stores are generally located in the larger cities, while the "associate" stores are found in smaller communities. As of December 31, 1956, Western Auto had seven company-owned and ninety-one associate stores in South Carolina.

The contracts which Western Auto enters into with its associated stores authorize them to use the name "Western Auto Associate Store." This is considered a valuable right because of the good will which the Western Auto Supply Company has developed. The contracts are cancellable at will by either party upon sixty days written notice. Each contract requires only that the associate shall purchase a stipulated amount of merchandise for an opening stock. Nothing in the contract itself prohibits the purchase and sale of items from other sources, and there is no provision for minimum purchases from Western Auto after the opening order.

Beginning in 1950, however, Western Auto's representatives, it is alleged, began to coerce certain of the associate stores in South Carolina and Georgia, including the plaintiff-retailers, to discontinue the sale of merchandise supplied by competitors. The announcement was made that associate stores should not sell "outside" seat covers, television sets and certain other products. From 1950 to 1956 Western Auto's representatives continually threatened to cancel the franchises of dealers who did not handle Western Auto's "Wizard" seat covers and its "Truetone" television sets. The principal controversy appears to have been over television sets; pressure was applied to some of the plaintiff-retailers to give up selling all competing television sets, while others were told to restrict their handling of outside sets.

The plaintiff-retailers refused to accede fully to Western Auto's demands because they had found that outside television sets, particularly Sylvania sets, sold better than Western Auto's Truetone models. They did, however, limit their outside purchases to a degree in order to retain their franchises which were considered valuable because of Western Auto's other lines. As a result, the plaintiff-retailers purchased some Western Auto merchandise they did not want and otherwise would not have purchased. Notwithstanding these additional purchases from the defendant, the franchises of these associates were eventually cancelled because of their refusal to respect Western Auto's distribution policies.

In their complaint, the plaintiff-retailers claimed damages for losses said to have resulted from pressure applied by representatives of Western Auto during

---

3. Since we are reviewing an order sustaining the defendant's motion to dismiss, the recitals of the complaint which were well pleaded are treated as facts.

the period prior to the cancellation of their franchises. In particular they charged that they (1) lost profits because of their inability to sell outside merchandise unfettered by defendant's pressures, (2) lost profits as a result of being forced to stock and sell defendant's inferior products, and (3) lost cash discounts and freight allowances which would have been available from outside wholesalers.[4] The retailers also sought damages for (4) the ultimate cancellation of their contracts which was said to have resulted in (a) loss of good will and value attaching to their Western Auto franchises, and (b) loss of anticipated profits in the reasonable future. The plaintiff McElhenney Co., Inc., the former Sylvania distributor, claimed to have been damaged by the restrictions Western imposed upon its customers, as a result of which McElhenney's market among such customers for television sets, and replacement parts which it also handled, was materially reduced.

■ Generally speaking, the right of customer selection is sanctioned by both statute and case law. Absent conspiracy or monopolization, a seller engaged in a private business may normally refuse to deal with a buyer for any reason or with no reason whatever. Thus, the courts have until now not held a seller liable in damages for refusing to deal with one who is unwilling to enter into an unlawful vertical price agreement or an exclusive dealing arrangement. Clothed with this privilege, the seller not only may, but ordinary fairness would require that he should announce in advance the circumstances under which he will do business with others.

■■ This is not to say however that the course of dealing between seller and buyer may not go beyond mere customer selection and the independent announcement of policy and ripen into an implied

or informal agreement or understanding. But whether there is such agreement is always a question of fact to be determined in light of all the circumstances when the case on a properly pleaded complaint is brought to trial (Cf. United States v. Colgate & Co., 1919, 250 U.S. 300, 39 S. Ct. 465, 63 L.Ed. 992; United States v. A. Schrader's Son, Inc., 1920, 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471; Frey & Son, Inc., v. Cudahy Packing Co., 1921, 256 U.S. 208, 41 S.Ct. 451, 65 L.Ed. 892). To support a right of action for treble damages, the challenged agreement must be violative of one of the provisions of the several antitrust laws. Here the claim is that the defendant infringed Section 3 of the Clayton Act and Section 2 of the Sherman Act.

### Section 3 of the Clayton Act.

■ In essence Section 3 of the Clayton Act prohibits leases, sales or contracts for the sale of goods and commodities made on the condition, agreement or understanding that the purchaser shall not use or deal in the goods and commodities of the seller's competitors where the effect may be to substantially lessen competition or tend to create a monopoly. This section, like others of the Clayton Act, was intended to reach specific conduct which had been held by the courts to be outside the ambit of the Sherman Act and which the Congress felt must be proscribed in order to promote competition. The Congressional history, 51 Cong.Rec. 9161, indicates that while Congress was aware of other business practices which might also be harmful to the economy, it was attempting to outlaw only those with which the section expressly dealt.

■■ Neither in terms nor inferentially does the statute prohibit a unilateral refusal to sell. Its condemnations are directed against executed transac-

---

**4.** Certain of the plaintiff-retailers also claimed damages resulting from the closing of their stores which they attributed to the defendant's restrictive policies. All of the plaintiff-retailers are still in business. All those who closed their stores have opened new ones. Snipes who owned two stores has closed one of them, but continues to operate the other. Two of the plaintiff-retailers are now affiliated with Firestone.

tions of lease, sale or contract containing the forbidden condition, agreement or understanding. Quite correctly the District Court pointed out that a mere refusal by a manufacturer to deal with a retailer who will not confine his dealings to the goods of the manufacturer does not run afoul of the section. The cases are unanimous in this: Nelson Radio & Supply Co. v. Motorola, Inc., 5 Cir., 1952, 200 F.2d 911, certiorari denied 1953, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356; Leo J. Meyberg Co. v. Eureka Williams Corp., 9 Cir., 1954, 215 F.2d 100, certiorari denied 1954, 348 U.S. 875, 75 S.Ct. 113, 99 L.Ed. 689; Brosious v. Pepsi-Cola Co., D.C.M.D.Pa.1945, 59 F.Supp. 429, affirmed 3 Cir., 1946, 115 F.2d 99; Allied Equipment Co. v. Weber Engineered Products, 4 Cir., 1956, 237 F.2d 879.

■ Appellants incorrectly interpret the ruling of the court below as limiting the reach of Section 3 to those instances where exclusive dealing is brought about by contract expressly imposing a "legal" obligation on the part of the buyer not to handle the goods of others. The District Court's opinion will not sustain this reading. The court was differentiating between an agreement of exclusivity on the one hand, and a naked refusal to deal on the other. It did not suggest that the illegal condition, agreement or understanding may not be implied from a course of dealing between the parties. Probably nothing is more firmly settled in our antitrust jurisprudence than that an illegal contract may be inferred from all of the circumstances. Admittedly, the written agreement between the parties contains no provision requiring the franchisees to deal only in goods supplied by Western Auto. This, of course, merely means that the contract is not unlawful on its face. The writing could be supplemented by an extrinsic course of conduct from which the illegal condition or understanding might be found. This the trial judge fully understood.

■ We have carefully examined the facts and circumstances upon which the plaintiffs predicate their claim of contravention of Section 3 through an implied understanding or course of dealing. There is no dispute about the fact that it was Western Auto's policy to have its associated retail stores push its own products and that it frowned upon their handling of competing goods. Plainly enough Western Auto wanted its dealers to advance sales of its merchandise, and threatened with cancellation and actually cancelled dealers who patronized its competitors to an extent which it felt jeopardized the value to it of the franchises issued to associated stores. But so far as the complaint shows it exacted no agreement against the handling of competing merchandise. The complaint itself makes clear that the plaintiffs during the period when the asserted understanding was in effect actually handled competitive articles. While the plaintiffs in their brief and in oral argument earnestly contended that Western Auto compelled franchised retailers to handle its full line of products, we find no clear cut allegation in the complaint that this was pursuant to a condition, agreement or understanding violative of the Clayton Act. This omission is sharply pointed up by the paragraphs relating to the individual plaintiffs, which disclose that they did not buy the defendant's full line and, indeed, supplemented Western's products with goods obtained from other sources. In short, plaintiffs' own statement of claim not only fails directly to allege but actually tends to negate any condition, agreement or understanding that plaintiffs shall not use or deal in the goods, wares or merchandise of a competitor of Western Auto.

■ The gravamen of a Section 3 violation is the forbidden condition, agreement or understanding of exclusivity, and a proper pleading should assert this ultimate fact. It makes no difference whether this is voluntary or is imposed by coercion, but without such agreement, condition or understanding, there can be no statutory infraction. It is only in the presence of this essential element that consideration must be given

as to whether competition may be substantially lessened or whether there is any tendency toward monopoly. Cf. Standard Oil Company v. United States, 1949, 337 U.S. 293, 69 S.Ct. 1051, 93 L. Ed. 1371; Dictograph Products v. Federal Trade Commission, 2 Cir., 1954, 217 F.2d 821. A wide latitude would be afforded plaintiffs at a trial to prove their claim through direct or circumstantial proof. Whether the proof would support a finding of implied agreement or understanding is a question which we do not reach in the present posture of the case.

■■■■ We agree with the District Court that an obligation devolves upon the pleader to set out clearly and unambiguously the operative facts upon which he relies. Repeatedly the plaintiffs' brief asserts that their complaint contains express and "implied allegations" sufficient to meet the requirements of the statute. It is not too much even under the liberal rules of pleading to require that the allegations be expressed in plain language, without such complete reliance as we have here upon mere implication. The complaint has been once amended, and apparently there was no application for further amendment. Under the circumstances, we might appropriately affirm without affording the plaintiffs any additional opportunity to plead over. However, in view of their strong insistence that they can establish from the course of dealing of the parties the condition, agreement or understanding which is the heart of the violation, we deem it just to remand the case to permit an application, to be addressed to the sound discretion of the District Judge, for permission to amend the complaint to state a violation of Section 3. The proposed pleading should accompany the application. This accords with the trend of the courts not to dispose finally of antitrust litigation upon the pleadings, without giving the plaintiff full opportunity to formulate his charges. Radovich v. National Football League, 1957, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456. Should there be a refor-

mulation of the complaint the customary pretrial procedures may still be availed of by the defendant to lay bare any deficiency in the plaintiffs' case.

### Section 2 of the Sherman Act.

■■■ We agree with the District Court that the pleading is equally deficient in framing a violation of Section 2 of the Sherman Act. As we have seen, the plaintiffs have failed to meet the less exacting requirements of the Clayton Act; nevertheless they would have the Court accept the same essential facts as a statement of a case under Section 2 of the Sherman Act. Their argument on this count is not that the defendant attempted to monopolize commerce in any particular product, but rather that it attempted to monopolize what they denominated "a method of doing business" by having its goods sold exclusively in the only stores in certain towns carrying a complete line of automobile and home supplies. It is not charged that these items were unavailable in other stores in each of the named towns, but simply that all of them could not be purchased in any other single store. Such charges do not amount to a requisite allegation of monopolization or attempt to monopolize which Section 2 of the Sherman Act condemns.

This count of the complaint thus is bereft of any averment of monopoly power in any defined market, or an intent to monopolize coupled with a dangerous possibility that a monopoly could be effectuated, or the improper employment of the defendant's position to attain ends forbidden by law. Lorain Journal v. United States, 1951, 342 U.S. 143, 153, 72 S.Ct. 181, 96 L.Ed. 162; Swift & Co. v. United States, 1905, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518. All that the plaintiffs have done is to apply the Sherman law label to the same facts which they charge constituted a Clayton Act transgression. While we doubt that they could replead effectively, nevertheless should the District Court see fit to permit a further amendment of the first count of the complaint, it may be dis-

**340**

posed to allow a like opportunity in respect of the Sherman Act count as well.

While the rulings of the District Court are affirmed, the case is nevertheless remanded to it to permit further application to be made by the plaintiffs in conformity with this opinion.

Affirmed and remanded.