The A. S. ABELL COMPANY, Appellant,

v.

John W. CHELL et al., and Robert F. Neugebauer, Intervenor, Appellees.

No. 12941.

United States Court of Appeals Fourth Circuit.

Argued Feb. 20, 1969.

Decided June 10, 1969.

John H. Lewin and Edmund P. Dandridge, Jr., Baltimore, Md., for appellants.

Melvin J. Sykes and Eli J. Golden, Baltimore, Md., for appellees.

Before HAYNSWORTH, Chief Judge, and WINTER and BUTZNER, District Judges.

WINTER, Circuit Judge:

The A. S. Abell Company ("Abell"), a publisher of daily morning and evening newspapers and a Sunday newspaper in Baltimore, sued 33 of its approximately 121 route owners, who buy newspapers at wholesale and sell them at retail and home delivery to subscribers. The suit was based upon the federal antitrust laws, and the complaint recited as its purpose a declaration: (a) that the contractual arrangements between the parties existing prior to March 29, 1968, were totally illegal and unenforceable, (b) that Abell's repudiation and rescission of the contracts as illegal was valid and effective, and (c) of Abell's legal rights in view of the action which it had theretofore taken and that which was contemplated in the future course of relations with route owners with respect to price maintenance. The complaint also sought an injunction against the charging of resale prices by defendants, alleged to have resulted from their illegal concerted price-fixing activities, in excess of Abell's suggested resale prices.[1] Defendants answered the

---

1. The specific prayers of the complaint, in addition to a prayer for general relief, were:

"1. That defendants, and each of them, be enjoined during the pendency of this action from charging the prices concertedly fixed by them as alleged for newspapers purchased from plaintiff for resale in excess of forty cents per week for each of The Sun and The Evening Sun, and twenty-five cents per week for The Sunday Sun.

"2. That the contractual arrangement, as it was construed and applied,

complaint, concurring in the prayer for a declaration of the illegality and invalidity of the contractual arrangement in existence between the parties prior to March 29, 1968, and further prayed, *inter alia*, that the court declare and enforce defendants' property rights in their routes apart from any specific provisions in any particular contract.

After the answer was filed, some discovery had ensued, when the court set for hearing defendants' motion for a continuance of the trial. At that hearing the district judge, on his own motion, inquired into whether he had the jurisdiction to grant the declaratory relief which the complaint prayed.[2] The district judge entered an order denying the specific relief prayed "without prejudice to a trial of the remaining issues of the case of whether the alleged actions of the defendants taken after May 6, 1968 were unlawful and, if so, warrant the issuance of injunctive relief * * *." The ruling was certified as one within 28 U.S.C.A. § 1292(b), and we allowed an interlocutory appeal. We reverse and remand the case for further proceedings.

The allegations and the nature of the relief sought are broad in scope and extend in time from approximately 1922 until the date suit was filed. They conveniently divide themselves by March 29, 1968, and hence our discussion should begin with the significance of that date.

Twenty-five days earlier—March 4, 1968—the Supreme Court of the United States decided Albrecht v. Herald Company, 390 U.S. 145, 88 S.Ct. 869, 19 L. Ed.2d 998 (1968). This was a suit by a route owner against the publisher of a morning newspaper distributed in the St. Louis metropolitan area. Route owners had exclusive territories which were subject to termination if they charged more than the publisher's suggested retail price. Albrecht, one of the route owners, adhered to the publisher's price for a considerable time, but then began to exceed it. In order to require Albrecht to lower his prices, the publisher informed his customers that it, itself, would deliver the paper to those who wanted it at the lower price, and it hired another party to solicit Albrecht's customers. As a result, about 300 of Albrecht's 1,200 customers switched to direct delivery by the publisher. During these events, the publisher continued to sell papers to Albrecht but threatened to discontinue doing business with him if he continued to overcharge. Still later, the publisher persuaded another route owner to take over the route, at least until such time as Albrecht would hew to the price line.

Albrecht sued, charging a combination of conspiracy in restraint of trade, under § 1 of the Sherman Act. The Court held that Albrecht had a cause of action under the Act. It stated that, in United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), it had been held that an illegal combination to fix prices resulted if a

---

which subsisted between plaintiff and each defendant prior to March 29, 1968, was and is invalid in its entirety and unenforceable by either party thereto.

"3. That the action of plaintiff taken March 29, 1968, in repudiating as illegal and terminating each said contractual arrangement with each defendant was and is valid and legally effective.

"4. That plaintiff, so long as it continues to act independently and unilaterally with regard to each defendant, is legally free to choose its own customers and to terminate its relationship completely with each defendant, and refuse

to sell its newspapers to such defendant.

"5. That plaintiff recover its costs".

2. The answer alleged as a first defense that the complaint failed to state a claim upon which relief might be granted. The record indicates, however, that the question of whether the court had jurisdiction to grant declaratory and injunctive relief was raised by the court *sua sponte* at a hearing on defendants' motion for a continuance. The format of the procedure was that the court announced its tentative conclusion and then afforded counsel an opportunity to persuade it otherwise. Counsel were unsuccessful.

seller suggested retail prices and secured compliance by means in addition to the mere announcement of policy and the simple refusal to deal. In *Albrecht* the doctrine was held applicable to the fixing of maximum prices, as well as minimum prices; and since, in the *Albrecht* case, the publisher did more than merely announce its policy and refusal to deal, an illegal combination was considered to have developed.

Acting upon its interpretation of *Albrecht*, Abell unilaterally cancelled its contracts with route owners on March 29, 1968, and purportedly started upon a new course of conduct. Thus, we consider separately the pre-March 29, 1968, and post-March 29, 1968, aspects of the total case.

Because the district judge decided the matter summarily as if he were ruling on a motion to dismiss under Rule 12(b), or a motion for judgment on the pleadings under Rule 12(c), we accept for the purposes of the appeal the allegations of the complaint well-pleaded. We do not refer to the allegations of the answer except where they admit allegations of the complaint or assert a foundation for cross-relief. At the time that the district judge ruled, some discovery had been completed, but the extent to which the district judge may have relied upon the answers to interrogatories and depositions is unclear, so that we cannot treat the district judge's disposition as one of summary judgment either under Rule 56, or the exceptions contained in Rules 12(b) and (c).

### PRE-MARCH 29, 1968, ASPECT OF THE CASE

After alleging its evident economic interest in the retail prices charged its ultimate subscribers,[3] Abell alleged that the contractual arrangement existing between it and each defendant until March 29, 1968, was substantially identical, and that the terms and conditions were a combination of rules and regulations adopted March 31, 1922, as a result of negotiations between it and a route owners' trade association, known as The Sun Route Owners' Association, which had as a committee the "Carriers' Council," a memorandum agreement between Abell and the Carriers' Council similarly negotiated in 1945, various memoranda changing minor provisions of the contractual arrangement with regard to rates from time to time thereafter, and certain oral agreements made between Abell and the route owners, or Abell and the Carriers' Council.

Abell alleged that these contractual arrangements permitted the route owners to take concerted action through the Carriers' Council in dealing with Abell in fixing wholesale prices and the performance of each route owner's individual contract, permitted the concerted participation of all route owners and Abell in the determination and fixing of resale retail prices from time to time, and granted each route owner a monopoly of selling Abell's newspapers at retail to householders within a designated geographical area. Abell further alleged that the route owners, through the Carriers' Council, exercised the price-fixing powers vested in them and also exerted economic pressure and coercion on it in regard to the fixing of wholesale and retail prices, discounts, terms and conditions of sale. As before stated, Abell, on March 29, 1968, unilaterally abrogated all previously existing contractual arrangements, purportedly because of their illegality under *Albrecht*.[4] On April 19, 1968,

---

3. Succinctly stated, the interest is two-fold. Abell derives revenues from the sale of newspapers and the sale of advertising space. Rates for the latter are directly affected by the number of subscribers, i. e., circulation and the number of subscribers is affected, *inter alia*, by the price of newspapers.

4. The specific reasons advanced in the notice of termination were as follows: "This review [of the decision in *Albrecht*] has led us to the conclusion that a number of provisions of the arrangement, one for the benefit of this Company and at least two others for the benefit of the Route Owners, are invalid under the Federal

Abell submitted to each route owner a new form of contract, the details of which will be set forth later.

Because the basis of the district judge's rulings is set forth only in his tentative views expressed orally at the hearing and subsequent colloquy with counsel when they tried to persuade him otherwise, we have difficulty in determining with complete accuracy exactly what the basis was. In regard to the pre-March 29, 1968, aspect of the case, the district judge was apparently of the view that since defendants joined in the prayer for declaratory relief, there was "no case of actual controversy" between the parties within the meaning of 28 U.S.C.A. § 2201, with the result that the district court lacked jurisdictional power to grant a declaratory judgment. We disagree.

On its face, the complaint raises issues under the federal anti-trust laws—indeed, at least one issue which, if the allegations can be sustained, indicates a course of dealing in violation of the teachings of *Albrecht*— and in the ordinary case, jurisdiction would clearly exist under 28 U.S.C.A. § 1337 irrespective of citizenship or amount in controversy and thus the jurisdictional requirement of 28 U.S.C.A. § 2201 would be satisfied. While jurisdiction cannot be conferred by consent if it does not otherwise exist, it is not insignificant that defendants, represented by competent counsel, conceded jurisdiction in their answer to the complaint.

We need not consider whether there would have been a "case of actual controversy" between the parties if Abell sought solely a declaration that its

previous contractual relations with route owners fell within the ambit condemned in *Albrecht* and if defendants conceded the illegality of the previous arrangements, because Abell prayed more, as have the route owners in their cross-prayer for relief. Abell alleged that it sought a declaration that the previous contractual arrangements were "totally illegal and unenforceable by any party thereto" and that its March 29, 1968, repudiation was "valid and legally effective * * * repudiating as illegal and rescinding said contractual arrangements and each of them." We, therefore, read Abell's requested relief as a declaration not only that *Albrecht* renders illegal that which was done, but that Abell is insulated from liability for any of the sequelae of that illegality.

Defendants' concession as to illegality under *Albrecht* does not extend to the latter. In their answer defendants prayed that the court declare and enforce their property rights in their routes apart from any specific provisions in any particular contract, notwithstanding that they concurred in the prayer for a declaration of the illegality and invalidity of the pre-March 29, 1968, contractual arrangements. In essence, defendants contend that the pre-March 29 contractual relationship, although illegal, established or' manifested a relationship between the parties which continues to exist. Clearly, therefore, there is considerable controversy concerning the residual effects of the admittedly illegal contracts and their purported termination by Abell. Furthermore, although it is not before us, we are advised that over 100 route owners have jointly filed a treble damage suit against Abell, in which jury trials are prayed, alleging that Abell, in part before the

anti-trust laws and these provisions, which permeate the entire contract, are of such a nature and so interdependent that each of these arrangements is completely invalid and unenforceable by either party. We refer specifically not only to the Route Owner's obligation relating to resale prices but also to the restrictions

upon us to permit an exclusive home delivery territory for each Route Owner and to engage in concerted action with the Route Owners as a group through their Carriers' Council in determining the original wholesale prices and terms, including the provision for arbitration."

decision in *Albrecht* violated the federal antitrust laws, on the theory that by means of the contracts Abell, *inter alia,* coerced defendants into illegal price maintenance. Thus, from a close reading of the pleadings, corroborated by subsequent events, it appears that there is a substantial dispute between the parties as to the effect of *Albrecht* upon the rights and liabilities of the parties for their dealings during the pre-March 29, 1968, era.

In concluding that there was a case of actual controversy and that the district court did possess jurisdiction to grant declaratory relief as to the pre-March 29, 1968, aspect of the case, we decide no more. The defendants have argued before us that the granting of declaratory relief is discretionary, citing, *inter alia,* Public Affairs Associates, Inc. v. Rickover, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962); A. L. Mechling Barge Lines, Inc. v. United States, 368 U.S. 324, 82 S.Ct. 337, 7 L.Ed.2d 317 (1961); Public Service Comm. of Utah v. Wycoff Co., 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952); Doby v. Brown, 232 F.2d 504 (4 Cir.), *cert. den.,* 352 U.S. 837, 77 S.Ct. 57, 1 L.Ed.2d 55 (1956); Carbide & Carbon Chemicals Corp v. United States Industrial Chemicals, 140 F.2d 47 (4 Cir. 1944); Aetna Casualty & Surety Co. v. Quarles, 92 F.2d 321 (4 Cir. 1937). We think that the doctrine of these cases is inapposite at the present stage of the proceedings for the reason that we do not understand that the district judge exercised any discretion that he may have possessed, and this failure precludes us from considering the correctness of his order on that basis. Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); Maryland Casualty Co. v. United Corp., 111 F.2d 443, 446 (1 Cir. 1940); Columbian Nat. Life Ins. Co. v. Foulke, 89 F.2d 261, 263 (8 Cir. 1937). There will be ample time for the district judge to consider this contention, as well as others we shall mention, when a sufficient record has been developed before him to provide him with a satisfactory basis on which to act.

Because the route owners' treble damage suit was filed after the district judge decided the instant litigation, on remand the district judge should consider also the effect of the pendency of other litigation on Abell's prayers for declaratory relief in the light of such authorities as Altvater v. Freeman, 319 U.S. 359, 366–367, 63 S.Ct. 1115, 87 L.Ed. 1450 (1943) (opinion of Frankfurter, J.); Carbide & Carbon Chemicals Corp. v. United States Industrial Chemicals, *supra;* Chicago Furniture Forwarding Co. v. Bowles, 161 F.2d 411 (7 Cir. 1947); McGraw-Edison Co. v. Preformed Line Products Co., 362 F.2d 339 (9 Cir.), *cert. den.,* 385 U.S. 919, 87 S.Ct. 229, 17 L.Ed. 2d 143 (1966). Possibly the district judge may conclude to consolidate the cases and sever and try separately common basic questions. Precisely what should be done we do not say, because there is before us only the bare pleadings in the instant case and none of the significant data which might be developed from counsel in argument on the point or at pretrial conference or from an examination of the pleadings in the treble damage suit; but we do not foreclose any of the myriad of possibilities which may be suggested by the parties as the case proceeds, or which may be indicated at a pretrial conference, to bring about the prompt and efficient administration of justice. In this regard we note that Abell has approximately 121 route owners, Abell has sued 33 of them, and over 100 have sued Abell. Declaratory relief may properly be withheld for nonjoinder of interested parties, Abbott Laboratories v. Gardner, 387 U.S. 136, 155, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (dictum); Franklin Life Ins. Co. v. Johnson, 157 F.2d 653, 658 (10 Cir. 1946) (dictum); but, if it otherwise appears that declaratory relief would serve a useful purpose, this rule should not be stringently applied when the court may order the joinder of additional parties, even on its own initiative, so as to be able

to give complete relief. Rule 21, Fed.R. Civ.Pro.

## POST-MARCH 29, 1968, ASPECTS OF THE CASE

To the extent that the district judge retained jurisdiction of the aspects of the case occurring post-*Albrecht*, i. e., whether defendants' actions taken after May 6, 1968, were unlawful and, if so, warrant the issuance of injunctive relief, no appeal has been sought and the correctness of this portion of the ruling is not before us. We confine ourselves to the post-March 29, 1968, portion of the case which the district judge dismissed.

After its March 29, 1968, unilateral termination of previously existing contractual arrangements, Abell alleged that it advised its route owners of suggested weekly home delivery prices and wholesale prices which Abell had concluded to charge and, further, how Abell intended to handle the matter of discounts and payments into a pension plan, and tendered a new form of proposed agreement to be entered into between Abell and each route owner.[5] Abell alleged that only one defendant responded to this communication, and that only three route owners, none of them defendants, undertook negotiations concerning the proposed new contract.

Abell alleged that on May 5, 1968, it put into effect new wholesale prices to each route owner for its newspapers to be sold thereafter. There follow a number of allegations with which we are not presently concerned, to the effect that the route owners concertedly took action to raise resale prices to their customers above Abell's suggested resale prices, and that such action was intended to cause, and did cause, substantial decreases in the circulation of Abell's newspapers. Lastly, Abell alleged that it might be necessary for it to exercise its rights to refuse independently to deal further with the defendants, and if it were required to take such action it might be subject to civil suits brought by defendants claiming that its refusal to deal constituted a violation of the antitrust laws. Collectively, on these allegations, Abell prayed a declaration that so long as it continues to act independently and unilaterally with regard to each defendant it is legally free to choose its own customers and to terminate its relationship separately with each defendant and refuse to sell its newspapers to each defendant.

As we read the opinion of the district judge and the colloquy in which he engaged, the complaint was dismissed as to this aspect of the case, essentially because Abell alleged a "purely hypothetical case." The district judge remarked that Abell was "asking the Court to be a party to the fixing of prices, and thereby to give the plaintiff immunity * * *" and, elsewhere, that "plaintiff wants an

---

5. Briefly stated, the contract would fix on an individual basis the number of copies of each newspaper to be purchased by the route owner, the price therefor, and the discounts and allowances applicable thereto. Abell would retain the right to change wholesale prices upon ten days' written notice. The proposed contract would also cover billing by Abell to the route owner, delivery of papers to the route owner, and the obligations of the route owner to his customers. Abell would agree to furnish the route owner from time to time with a schedule of suggested retail prices, although there was recognition that the route owner was not required contractually to adhere to the schedule. In this con-

nection, there was a full reservation of Abell's rights to refuse to deal with a route owner if he did not abide by the suggested schedule of retail prices. The contract could be terminated for cause or without cause and, in the event of termination, except by abandonment by a route owner, Abell agreed to purchase the route at the "fair market value" computed in accordance with a formula spelled out in the contract with a right to arbitration if the parties could not agree. With the approval of Abell, a route owner could assign his route. He was also required to carry certain minimum insurance policies and to deposit security for payment of the amounts he might thereafter owe Abell.

advisory opinion as to what it may do in the future in order to determine how much pressure it can put on the would be, or it hopes would be, contracting parties. It talks about being a disinterested party for further negotiations, but it wants this Court as its partner in its negotiations."

■ We do not question the existence or desirability of the rule that a declaratory judgment may not be given for a purely hypothetical situation or that the proper function of a declaratory judgment is not that of an advisory opinion. See, e. g., Public Service Comm. of Utah v. Wycoff Co., *supra*; St. Louis, Missouri, Paper Carriers Union No. 450 v. Pulitzer Publishing Co., 309 F.2d 716 (8 Cir. 1962). By the same token, a party is not required in all instances to take irretrievable steps and accrue peril before he may obtain a declaration of his rights. See, e. g., Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 61 S. Ct. 510, 85 L.Ed. 826 (1941); Altvater v. Freeman, 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450 (1943); Keener Oil & Gas Co. v. Consolidated Gas Utilities Corp., 190 F.2d 985, 989 (10 Cir. 1951). In considering the correctness of the district judge's views, we must take into consideration that current federal pleading is essentially notice pleading and not evidentiary pleading. It is true that the complaint is vague and general as to what future course of conduct Abell intends to take with respect to route owners, beyond that which it took immediately after termination up to filing suit, for which it prays a declaration of legality; but this is not to say that, on the basis of the mere complaint alone, Abell's request for relief should be conclusively presumed to be hypothetical, or that Abell should be charged with seeking to entice the district court into being its bargaining ally. Before Abell would be entitled to declaratory relief as to its future course of action it must prove with some degree of specificity what that action will be and the circumstances under which it will be taken, but Abell should not be denied the opportunity to advance such proof in support of the allegations it has made.

■ In short, we hold that the district judge was in error in his summary rejection of Abell's claim to declaratory relief concerning future conduct on the basis of what was before him. The district judge may well conclude, on proper gounds, that Abell is not entitled to such relief after further discovery, on motion for summary judgment, at a pretrial conference, or, on a required tender of proposed proof, such as was employed in Amplex of Maryland, Inc. v. Outboard Marine Corp., 380 F.2d 112 (4 Cir. 1967), cert. den., 389 U.S. 1036, 88 S.Ct. 768, 19 L.Ed.2d 823 (1968), to name some of the ways in which a proper record on which to apply the prohibition against declaratory judgments in hypothetical situations may be developed. The point is that more of a record must be developed before the conclusions which the district judge reached are sustainable.

In considering the post-March 29, 1968, aspects of the case which we now review, the district judge will have the same flexibility which we have earlier discussed. He may consider and conclude to consolidate or not to consolidate this aspect of the case with the other litigation which was subsequently filed, and he may conclude to require or not to require the joinder of additional parties. He will be free, after a record has been developed to show Abell's intended future course of dealings, to exercise fully the discretionary power to grant or withhold declaratory relief on any proper basis. Because we, too, have before us an inadequate record to decide these various possible questions, we intend no intimation of how they should be resolved.

Since the necessity for this appeal arose not at the instance of defendants, we shall require the parties each to bear their own costs.

Reversed and remanded.