MAGNUS PETROLEUM COMPANY,
INC., and Marpat Corporation,
Plaintiffs,

v.

SKELLY OIL COMPANY, Defendant.

No. 73-C-355.

United States District Court,
E. D. Wisconsin.

Jan. 18, 1978.

876

Walter, Hopp & Hodson, by Eugene F. Hodson, Sheboygan, Wis., for plaintiffs; Irving I. Saul, Dayton, Ohio, of counsel.

Quarles & Brady, by W. Stuart Parsons, Milwaukee, Wis., for defendant.

## DECISION and ORDER

MYRON L. GORDON, District Judge.

### I. INTRODUCTION

This is an antitrust case brought under § 1 of the Sherman Act and § 3 of the Clayton Act. After a nine-day jury trial, a general verdict was returned in favor of the plaintiffs in the amount of $185,000. Judgment was entered in the amount of $555,000, treble the amount of the verdict, pursuant to 15 U.S.C. § 15, plus attorney's fees and costs.

The defendant Skelly Oil Company has filed a motion for judgment notwithstanding the verdict or for a new trial. This motion has been comprehensively briefed by the parties. I find that the motion should be denied.

The plaintiff Magnus Petroleum Company is a Wisconsin corporation with its principal place of business in Sheboygan, Wisconsin. Magnus Petroleum distributes petroleum products, while the plaintiff Marpat Corporation purchases and leases real estate equipment in connection with the distribution of such products. Arthur P. Magnus owns and controls both of the plaintiff corporations. (Mr. Magnus and Magnus Petroleum may both be referred to herein as Magnus).

The defendant Skelly Oil Company is a Delaware corporation with its principal place of business in Wisconsin. It sells petroleum products in seventeen states including Wisconsin.

Central to this litigation are the mechanics and operation of certain agreements between the parties regarding three service stations operated by Magnus in Sheboygan. In 1964, 1965, and 1966, Magnus and Skelly entered into three separate "franchise sales agreements" in which Skelly agreed to deliver and Magnus agreed to buy specified quantities of gasoline, intermediate oils, antifreeze, lubricating oils, and grease. The 1966 franchise sales agreement was to remain in effect from March 1, 1966, until February 28, 1971. That agreement provided that Magnus purchase from Skelly 701,-100 gallons of gasoline and 768,600 gallons of intermediate oils each year.

In addition, the parties entered into transactions in 1964 and 1966 for the financing of three service stations operated by Magnus in Sheboygan. The pertinent undisputed features common to all of these transactions are as follows: Marpat borrowed money from a lender, giving in return its promissory note payable in 15 years. Marpat then gave Skelly a 15-year lease on a service station in return for rental payments from Skelly equal to the payments owed by Marpat to the lender on the note. This was known as the "base lease." Marpat assigned the rental payments from Skelly as security for the promissory note. Skelly in turn subleased the service station to Magnus Petroleum for a 15-year term for the same rental payments as those owed by Skelly to Marpat under the terms of the base lease. The Skelly-Magnus transaction was known as the "sub lease."

## II. JUDGMENT NOTWITHSTANDING THE VERDICT

■ A motion for judgment notwithstanding the verdict should not be granted unless the plaintiff has failed to present a prima facie case. *Hallmark Industry v. Reynolds Metals Co.,* 489 F.2d 8, 13 (9th Cir. 1973).

The court of appeals for the seventh circuit has set forth the following test against which the defendant's motion for judgment notwithstanding the verdict must be judged:

> "The motion is properly denied where the evidence, along with all inferences to be reasonably drawn therefrom, when viewed in the light most favorable to the party opposing such motion, is such that reasonable men in a fair and impartial exercise of their judgment may reach different conclusions." *Funk v. Franklin Life Insurance,* 392 F.2d 913, 915 (7th Cir. 1968).

Cognizant of this standard, I proceed to a consideration of the issues raised by the defendant's motion for judgment notwithstanding the verdict.

### A. *Clayton Act § 3*

Section 3 of the Clayton Act, 15 U.S.C. § 14, provides in part:

> "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods . . . or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, . . . of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

The defendant urges that the evidence in this case failed to demonstrate the existence of an express or implied "condition, agreement or understanding that the lessee or purchaser . . . not use or deal in the goods . . . of a competitor. . . ." The plaintiffs respond by contending that the evidence showed that Skelly did "discount from, or rebate upon" the price of gasoline sold to Magnus "on the condition, agreement or understanding" that Magnus

not purchase gasoline from other sellers. The plaintiffs point to exhibit 61 showing that in 1969 Magnus purchased 700,500 gallons of gasoline from Skelly and 510,982 gallons from other sellers; and to exhibit 62, purporting to show Skelly's decision thereafter to require Magnus to purchase the same number of normally-priced gallons as price protected gallons from Skelly. According to the plaintiffs, this Skelly policy meant that Magnus would have to purchase all his requirements of gasoline solely from Skelly and that competition in the Sheboygan retail gasoline market would probably be lessened substantially thereby.

Skelly claims that the plaintiffs should not be permitted to assert this theory for the first time at this stage of the litigation. I find this contention well taken. The plaintiffs' current argument as to the Clayton Act violation in this case was not set forth in the complaint or advanced at trial, and it accordingly should not be considered on this motion.

It does not follow, however, that the plaintiffs failed to sustain their burden of showing at trial the existence of an exclusive dealing arrangement. The evidence viewed in a light most favorable to the plaintiffs may reasonably be interpreted to show that the parties' franchise sales agreement was implemented so as to include a condition that Magnus not deal in the gasoline of other suppliers.

The defendant advances a number of arguments in opposition to such a conclusion. It contends that the franchise sales agreements were not mentioned in the complaint and therefore may not be considered in determining whether any violation of the antitrust laws occurred. In view of the complaint's several references to the "various leases, sub-leases, and financial instruments," I am unpersuaded by the latter argument.

The defendant also points to exhibit 418, which shows that in 1970 and 1971 Magnus purchased gasoline from sellers other than Skelly. Such evidence is not, however, inconsistent with other evidence showing that Magnus was under great pressure to purchase all of his requirements of gasoline from Skelly Oil. Elmer J. Peterson, a Skelly territorial representative for an area including Wisconsin, stated by deposition that if a Skelly jobber consistently purchased substantial quantities of product from other sellers, the jobber would be asked to sign a mutual cancellation of his franchise. If the jobber were unwilling to do so, Mr. Peterson would recommend that the jobber's franchise be cancelled on 60 days' notice. Moreover, there was testimony by Denzel Luke, a Skelly field representative, that the Magnus franchise was eventually continued on only a month-to-month basis so that Mr. Magnus would be persuaded to increase his purchases of Skelly products. Following the conversion to a month-to-month arrangement, Magnus did, in 1972, purchase virtually all of his gasoline requirements from Skelly Oil.

Such evidence, in my opinion, charts "an extrinsic course of conduct from which the illegal condition or understanding" could have been found in this case. *McElhenney Co. v. Western Auto Supply Co.,* 269 F.2d 332, 338 (4th Cir. 1959).

Skelly attacks this view of the evidence by offering other explanations which assertedly are more plausible and which also find support in the record. For instance, Skelly claims that in 1972 Magnus bought considerably more gasoline from it than from other suppliers because of the advent of an oil shortage. Also, Skelly urges that Magnus was relegated to a month-to-month status because of his poor past credit record. However, I conclude, after considering the evidence and the inferences to be drawn therefrom in a light favoring the plaintiffs, that the jury could reasonably have decided that the parties' agreement contained an implied condition that Magnus not deal in the product of other suppliers.

In order to establish a violation of § 3 of the Clayton Act, the plaintiffs also must show that the effect of the "condition, agreement or understanding" to refrain from dealing in goods of another seller "may be to substantially lessen competition . . . in any line of commerce."

It has been held that this aspect of § 3 will be satisfied by "specific evidence of market foreclosure in a relevant market in which the exclusive contracts exist." *L. G. Balfour v. FTC,* 442 F.2d 1, 19 (7th Cir. 1971); *Tampa Electric v. Nashville Coal,* 365 U.S. 320, 327–9, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). However, there is also authority for the proposition that

". . . knowledge of the share of the market foreclosed is not invariably required to determine whether exclusive dealing arrangements violate Section 3 of the Clayton Act. The test remains whether the jury can find from all the circumstances that the effect of the particular arrangements 'may be to substantially lessen competition or tend to create a monopoly in any line of commerce; and, as the Clayton Act tying clause cases demonstrate, this may appear from facts other than the proportion of total commerce in the relevant market which is subject to restraint." *Lessig v. Tidewater Oil Co.,* 327 F.2d 459, 468 (9th Cir. 1964).

Skelly contends that the plaintiffs have failed to present evidence of a relevant market and of the probable effect on competition of the agreements involved in the instant action. The market definition presented by Skelly assertedly showed that the operation of the Magnus-Skelly agreements would probably effect a minimal, not a substantial, lessening of competition on that market.

Under the lease agreements and financial arrangements, if Magnus wished to terminate his relationship with Skelly as a Skelly jobber, he would have to obtain within 60 days the funds to pay off the balance of the 15-year mortgages. However, Skelly would not thereupon release the stations to the jobber. Rather, if Magnus elected to continue operating the stations, he would be obligated to continue to purchase annually the lesser of 100,000 gallons, or 50% of his yearly volume, of gasoline. As is more fully described below, Magnus claimed in this action that by operation of these provisions of the parties' agreements, he was foreclosed from purchasing the Jackson Oil Company and from becoming a jobber for Sunray DX.

The defendant's expert, Bruce Caputo, proposed that the relevant market was the 13-county area in southeastern Wisconsin where Magnus purchased gasoline. Mr. Caputo testified that Magnus' total requirements for gasoline comprised anywhere from .07 to .18 of 1% of that market during the years 1964 to 1975. Skelly contends that the probable lessening of competition over such a percentage of the relevant market would necessarily be insubstantial.

In addition to Mr. Caputo's definition of the relevant market, Denzel Luke testified that in 1968 Skelly had between 140 and 150 jobbers in the "northern region," an area including Wisconsin. Among these jobbers there were approximately 40 to 50 separate financing programs involving lease and sublease arrangements. There also was testimony by Fred C. Allvine and Wayne A. Dirks from which the jury could have inferred that under Skelly's finance arrangements in general, the service station leases were non-cancellable at Skelly's option even if the balance of the outstanding mortgage were tendered within 60 days by the jobber. Furthermore, Maurice B. Holdgraf testified that a prospective supplier of a jobber would not permit that jobber to maintain a "dual distribution," that is to purchase product from suppliers of two different brands of gasoline.

According this evidence the favorable inferences to which it is entitled on this motion, the jury could have concluded that numerous other jobbers in the relevant market who were parties to financing arrangements with Skelly were precluded by the above-described terms of those arrangements from becoming jobbers for suppliers of other brands of gasoline. The jury could have concluded that the effect of all such financial arrangements in the relevant market may have been to substantially lessen competition. Such a lessening of competition need be only potential, not actual. *Standard Oil Co. v. United States,* 337 U.S. 293, 314, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

## B. Sherman Act § 1

■ Section 1 of the Sherman Act, 15 U.S.C. § 1, provides in part that "[e]very contract . . . in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." Skelly contends that § 1 proscribes only unreasonable restraints of trade and that no evidence of any such restraint on any relevant market was presented at trial. Skelly also argues that an intent to restrain trade alone, without a concomitant showing of actual restraint, does not violate § 1 of the Sherman Act.

Turning first to Skelly's second argument, there are cases indicating that both the object and the effect of a restraint must be considered in determining whether a violation of § 1 has occurred. *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1246–8 (3rd Cir. 1975); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264, 1275 (9th Cir. 1975); *Jewel Tea Co. v. Local Unions,* 274 F.2d 217 (7th Cir. 1960). However, it has also been held that "contracts may . . . be banned by § 1 if unreasonable restraint was either their object *or* effect." (emphasis supplied). *Times-Picayune v. United States,* 345 U.S. 594, 614, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953); accord, *Cities Service Oil Co. v. Coleman Oil Co.,* 470 F.2d 925, 930–1 (1st Cir. 1972). Applying the latter standard, a violation of § 1 of the Sherman Act may be found in the case at bar.

■ There was ample evidence from which the jury could have concluded that the object of the financing arrangements was to restrain trade. Skelly contends that its desire to secure and maintain representation in an area may not be viewed as an intent to restrain trade. Based on previously mentioned testimony about the operation of the financing arrangements, wherein Skelly required a jobber who wished to terminate his relation with Skelly to satisfy the balance of the mortgage obligation within 60 days and continue to purchase substantial quantities of gasoline each year, the jury could have concluded that Skelly had not a "wish to maintain representation"

in an area, but instead an intent to restrain trade in the relevant market described in the prior discussion of the Clayton Act.

## C. Damages

### 1. Injury to business or property

15 U.S.C. § 15 permits any person injured in his "business or property" by a violation of the antitrust laws to recover treble damages therefor. Skelly claims that Mr. Magnus did not sustain injury to his "business or property" within the meaning of that statute.

The plaintiffs contended at trial that the above-described financing arrangements in effect between Magnus and Skelly precluded Magnus from terminating his position as a Skelly jobber or from taking the service stations and becoming a jobber for another oil company. This was true because Skelly would refuse to release the leases even on a jobber's payment of the entire balance due on the mortgage within 60 days of notice of termination. In addition, Skelly would require the jobber to continue to purchase a significant quantity of gasoline, as already described, after terminating the Skelly-jobber relationship.

■ Mr. Magnus claims that by operation of the financing arrangements, he was precluded from becoming a jobber for Sunray DX and that he was unable to purchase the Jackson Oil Company. Skelly argues that an expectation or hope to enter business for Sunray DX or to purchase the Jackson Oil Company does not meet the requirement of an injury to business or property under 15 U.S.C. § 15.

It is not necessary actually to obtain or operate the business in question in order to maintain a suit for injury to such business under the statute. An attempt to enter a business is sufficient if both (1) an intention and (2) preparedness to enter the business are shown. *Martin v. Phillips Petroleum Co.,* 365 F.2d 629, 633 (5th Cir. 1966).

It would appear that the evidence amply demonstrates Magnus' intent to purchase the Jackson Oil Company and to become a

Sun franchisee. Magnus contacted, and was contacted by, persons interested in accomplishing these transactions. Certain negotiations ensued. This is sufficient to demonstrate Magnus' intent. *Martin v. Phillips Petroleum Co.*, supra.

With respect to Jackson, Skelly argues that Magnus did not have the financial capacity to purchase the concern. As to Sun, Skelly claims that because Magnus never informed it of his offer from Sun or broached the possibility of paying the balance owing on the mortgages in return for a release of the leases, the plaintiffs have not demonstrated either their intent or their preparedness to become a Sun jobber.

■ The plaintiff's ability to finance the business, the consummation of contracts, affirmative steps to enter the business, and prior background and experience in the business are all factors to be considered in determining whether a plaintiff has shown himself prepared to enter a business under 15 U.S.C. § 15. *Martin v. Phillips Petroleum*, supra, 633, 634.

■ The testimony shows that Magnus had considerable prior experience in the operation of service stations and in the sale of petroleum products. Moreover, as stated above, Magnus did take affirmative steps to arrange the acquisition of Jackson and to become a Sun franchisee. Most importantly, the testimony of Messrs. Holdgraf and Luke and the deposition of Mr. Peterson to the effect that dual distribution jobberships were disfavored by supplier oil companies gives rise to the inference that Magnus could have been precluded from entering other businesses, not because of a lack of intention or preparedness on his part, but because of the terms under which Magnus would be permitted to terminate his Skelly jobbership. Although Skelly points to evidence of Magnus' financial inability to purchase Jackson and of his failure to ask Skelly about the possibility of releasing the leases, I believe that these are simply factors which the jury was entitled to consider, along with the others set forth above, in determining whether Magnus did demonstrate an attempt to enter the two businesses and thus incurred an injury to his "business" under the statute.

### 2. *Causation*

■ The plaintiffs had the burden at trial of demonstrating a causal relationship between their damages and Skelly's actions. *Copper Liquor, Inc. v. Adolph Coors Co.*, 509 F.2d 758, 759 (5th Cir. 1975); *Story Parchment Co. v. Paterson Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931). Skelly argues that Magnus' damages may not be attributed to it because Magnus never offered to terminate the agreements, and that if he had so offered, the service stations would have reverted to him regardless of Skelly's position on the matter because the parties' agreements amounted to a mortgage. Skelly also claims that it did not cause Magnus' damages because Sun had reasons of its own for not making Magnus their franchisee.

In *Milwaukee Towne Corp. v. Loew's, Inc.*, 190 F.2d 561, 566–568 (7th Cir. 1951), the court ruled that the plaintiff was barred from recovering damages under the antitrust laws for the defendants' failure to provide him with first-run motion pictures for his then second-run motion picture theatre in the absence of a request for such motion pictures. Here, Mr. Magnus never asked Skelly whether Skelly would consent to release Magnus, without further obligation, from the financial arrangements, if Sun provided the sum to pay off the balance of the mortgage. Skelly contends that it would have accepted such a request if made because of its continuing credit difficulties with Magnus. However, Mr. Magnus testified that after he attempted to cancel his jobbership with Skelly in 1968, he rescinded such cancellation after Skelly's Mr. Terwilliger informed him of the agreements' provisions, already described, which would become effective on termination. In 1970 and 1971, during the period of his negotiations with Sun, Mr. Magnus testified that he asked Mr. Terwilliger whether Skelly's policy of refusing to release the leases and requiring continued annual purchases of gasoline had changed. Mr. Terwilliger

882

responded that the policy had not changed. Mr. Magnus also stated that he was afraid to tell Skelly in specific terms of his negotiations with Sun because of what he considered the real possibility that Skelly would thereupon terminate his franchises.

It is apparent from the above-summarized testimony that the situation presented by this case may be distinguished from that set forth in *Milwaukee Towne Corp.*, supra. Here Magnus made inquiries on a number of occasions in order to ascertain Skelly's policy on termination of his jobberships. Although Skelly claims that it would have agreed to a termination, it did not suggest that to Mr. Magnus when he made his inquiries in 1968 and in 1970 or 1971. The jury was entitled to consider the nature of Mr. Magnus' inquiries and his reasons for refraining from disclosing potential business opportunities to Skelly personnel in deciding whether Skelly's actions resulted in Mr. Magnus' inability to become a Sun franchisee.

I find Skelly's argument that the agreements were actually a mortgage, such that the service stations would necessarily have become Magnus' property on satisfaction by him of the underlying debt, of minimal relevance. There is ample evidence demonstrating that neither Magnus nor Skelly viewed the agreements in that fashion while such agreements were in effect. Nothing in the agreements or in their implementation by Skelly would have suggested such a possibility to Magnus during his negotiations with Jackson or Sun.

Although there was evidence that Sun at one time was not interested in acquiring Wisconsin jobbers, there was also evidence that this policy was not in effect at all times pertinent to the Magnus-Sun negotiations. Moreover, there was evidence that Sun was dissuaded from concluding an agreement with Magnus because the Magnus-Skelly leases and financing agreements obligated Magnus to purchase gasoline from Skelly even after full payment of the underlying debt. The evidence showed that dual distributorships were shunned by companies seeking prospective franchisees.

The jury could properly have concluded, on a consideration of all of this evidence, that Skelly's actions, not Sun's, caused Magnus to lose the Sun franchise opportunity.

3. *Nature of the evidence of damages*

At trial, Magnus presented evidence of lost profits for the period March 1, 1971, to September 30, 1976, and lost good will because of the failure to acquire the Jackson Oil Company and to become a Sun franchisee. In order to show lost profits as to Jackson, the plaintiffs' expert, Neil Vanderjagt, obtained an annual profit figure for Jackson from the company's 1969 tax return, divided that figure by 12, and then multiplied it by 67 (the number of months from March 1, 1971, through September 30, 1976). Lost profits as to Sun were computed by determining that Sun handled about 1.2671 times more gallons of gasoline annually than did Jackson. That figure was then multiplied by the Jackson lost profits figure, derived as explained above, to obtain the amount of Magnus' lost future profits by not becoming a Sun franchisee. Mr. Vanderjagt obtained Sun's annual gallonage from exhibit 145, which reflects Mr. Magnus' notes of such gallonage from a conversation he had with Sun's Merle Rossing.

Skelly claims that all damages are speculative because they are based on documents which are either inadmissible or nonprobative of Jackson's and Sun's true financial circumstances. Skelly further attacks the plaintiffs' claimed damages for loss of good will as to Jackson on the ground that the plaintiffs' expert did not subtract therefrom Magnus' cost to obtain Jackson in the first instance.

Skelly particularly urges that Mr. Magnus' notes of a conversation with Merle Rossing (exhibit 145), from which Sun's annual gallonage volume was derived, was hearsay and therefore inadmissible. Contrary to the defendant's assertion, I believe that exhibit 145 was admissible under the business record exception to the hearsay rule, Federal Rules of Evidence 803(6). Skelly contends that the exhibit was not

"kept in the course of a regularly conducted business activity" and was untrustworthy, thus making Rule 803(6) inapplicable. In my opinion, Magnus' notes, made in the course of negotiations for a business opportunity, were a part of a regularly conducted business activity. Although the notes were ultimately used in connection with the plaintiffs' damages presentation, it has not been shown that the notes were inaccurate when made by Magnus, or that Mr. Rossing provided Magnus with incorrect information.

While it is true that speculative damages may not be recovered, I am unable to hold that the plaintiffs' damages presentation was founded on mere speculation. Damages may be shown "as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). Although the plaintiffs' loss may have been ascertained by other methods, I cannot say, according all favorable inferences to the evidence presented, that such evidence amounted to nothing more than speculation or guesswork. I note also that during the defendant's thorough cross examination of the plaintiffs' expert regarding the latter's determination of the plaintiffs' damages, many of the points raised on this motion were emphasized. The jury was thereby alerted to the asserted weaknesses in the plaintiffs' claimed damages.

D. *Statute of Limitations*

Skelly contends that the plaintiffs' action is barred by the applicable statute of limitations contained in 15 U.S.C. § 15b. That section provides in part that "[a]ny action to enforce any cause of action under [15 U.S.C. § 15] . . . shall be forever barred unless commenced within four years after the cause of action accrued." Citing *Baldwin v. Loews, Inc.*, 312 F.2d 387 (7th Cir. 1963), *Emich Motors Corp. v. General Motors Corp.*, 229 F.2d 714 (7th Cir. 1956), and *Metropolitan Liquor Co., Inc. v. Heublein, Inc.*, 305 F.Supp. 946 (E.D.Wis.1969), among other cases, Skelly contends that the

cause of action in this case accrued in 1964 and 1966 when the contracts were signed or, alternatively, in 1968 when Mr. Terwilliger advised Mr. Magnus of the consequences on termination of the parties' agreements.

In *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 339, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971), a case decided subsequent to the decisions on which the defendant relies, the United States Supreme Court stated:

" . . . it is hornbook law, in antitrust actions as in others, that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable. (citations omitted)

" . . . the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted." (citations omitted)

Although Skelly attempts to distinguish *Zenith Radio* as an antitrust conspiracy case, I find the case's generalized observations about the statute of limitations here involved to be pertinent to the case at bar. At a proceeding in this action on March 1, 1976, I denied Skelly's motion for summary judgment in reliance on *Zenith Radio*. Now that Skelly has raised the identical issue again on the instant motion, I persist in my view that *Zenith Radio* controls.

Applying *Zenith Radio*, therefore, it is apparent that the cause of action accrued on the date that the plaintiffs' damages were inflicted, which is the point at which they became unspeculative and provable. The plaintiffs were not damaged by the defendant's termination policy until they were unable, by merit of that policy, to obtain the Jackson Oil Company or to consummate a franchise agreement with Sun, both of which occurred in 1970. Since the action was filed on July 3, 1973, it is not barred by the four-year statute of limitations.

## III. NEW TRIAL

Skelly raises many of the contentions advanced on its motion for judgment notwithstanding the verdict in support of its alternative motion for a new trial. I find those arguments insufficient to justify a new trial, for the reasons previously stated in this memorandum.

With respect to jury instructions, Skelly contends that the plaintiffs' instructions two, seven, seven (c), and seven (d) should not have been given. As to instruction two, I have already ruled, adversely to Skelly, that the franchise sales agreements were properly within the scope of the allegations of the complaint. I believe that instructions seven, seven (c), and seven (d) were properly given, consistent with my prior determination that restraint may be either an object or an effect under § 1 of the Sherman Act.

Skelly also argues that its instructions twelve and fourteen (A) should have been read to the jury. Instruction twelve was not required, since I have already indicated that under the circumstances Mr. Magnus was not obligated to inform Skelly of his prospect with Sun as a necessary prerequisite to recovering damages for that lost opportunity.

The defendant further contends that it was error to omit that portion of instruction fourteen (A) which provided a caution to the jury in its evaluation of the plaintiffs' damages evidence. I believe that the omission of this portion of the instruction was not error because similar guidelines for the evaluation of damages testimony and expert testimony were given to the jury in instructions fourteen, twenty-two and Devitt and Blackmar § 71.08.

Finally, Skelly argues that the one-month hiatus between the close of the evidence in this action and the final arguments requires a new trial. I note at the outset that both parties were repeatedly warned by me during the course of trial that the case might not be completed because of other matters on the court calendar which also required attention. In spite of these warnings, Skelly did not interpose an objection at trial to the one-month continuance. I am unable to conclude that the continuance affected the defendant's more than it did the plaintiffs' case. I find no special prejudice which accrued only to Skelly because of the regrettable but necessary decision on my part to consider other pressing matters after permitting this civil action to proceed to trial continuously for more than one week.

For the reasons stated in this decision, the defendant's motion for judgment notwithstanding the verdict or for a new trial will be denied.

Therefore, IT IS ORDERED that the defendant's motion for judgment notwithstanding the verdict or for a new trial be and hereby is denied.