**MAGNUS PETROLEUM COMPANY, INC. and Marpat Corporation, Plaintiffs-Appellees, Cross-Appellants,**

v.

**SKELLY OIL COMPANY, Defendant-Appellant, Cross-Appellee.**

Nos. 78–1387, 78–1388.

United States Court of Appeals, Seventh Circuit.

Heard Feb. 14, 1979.

Decided May 23, 1979.

Rehearing and Rehearing En Banc Denied June 20, 1979.

---

W. Stuart Parsons, Milwaukee, Wis., for defendant-appellant, cross-appellee.

Irving I. Saul, Dayton, Ohio, for plaintiffs-appellees, cross-appellants.

Before CUMMINGS and SPRECHER, Circuit Judges, and LEIGHTON, District Judge.*

CUMMINGS, Circuit Judge.

This private antitrust action was brought in July 1973 by a Sheboygan, Wisconsin, gasoline and fuel oil distributor (Magnus)

---

* District Judge George N. Leighton of the Northern District of Illinois is sitting by designation.

and the Company (Marpat) owning the land and buildings involved in the distributorship.[1] Defendant Skelly Oil Company (Skelly) formerly was Magnus' supplier of gasoline, furnace oil and related products.[2] In seeking damages in excess of $700,000 (before trebling under Section 4 of the Clayton Act, 15 U.S.C. § 15), plaintiffs asserted that the defendant violated Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 3 of the Clayton Act (15 U.S.C. § 14).

According to the complaint, plaintiffs marketed Skelly's petroleum products in Sheboygan County, Wisconsin, and adjacent areas from 1964 until February 28, 1973, when Skelly terminated its relationship with plaintiffs. The parties stipulated that plaintiffs were both wholesale and retail gasoline distributors. In the former capacity, they were "jobbers," operating two bulk plants (storage facilities). One of these, in Haven, Wisconsin (seven miles from Sheboygan), was owned by Magnus. Another facility, located in Sheboygan, was leased by Magnus from Skelly. In its capacity as a jobber, Magnus on February 29, 1964, entered into a "Franchise Sales Agreement" with Skelly. Under this agreement, Magnus was committed to buy and Skelly to sell and deliver certain specified quantities of gasoline each year.[3] Magnus also agreed to sell and deliver petroleum products to four specified Skelly-owned stations in the Sheboygan area.

The complaint states that the mainstay of plaintiffs' retail distributorship was the fee ownership of four retail gasoline service stations in the Sheboygan area. Three of those were financed through a plan offered by Skelly to its jobbers. Plaintiffs' complaint describes this financing arrangement as

"a base lease for a term of fifteen (15) years running from plaintiff, MARPAT, to defendant, SKELLY, the rentals on which base leases are assigned to the financing source,[4] coupled with a sub-lease from defendant, SKELLY, to plaintiff MAGNUS also for fifteen (15) years but each such sub-lease being subject to an earlier termination by SKELLY should MAGNUS purchase less than 100,-000 gallons annually of Skelly branded gasoline for resale at that respective service station" (Par. 16 of the complaint).

Skelly's rent under the base lease thus secured Magnus' obligation to the lender. According to plaintiffs, the sub-lease and obligation to purchase 100,000 gallons of gasoline annually from Skelly could not be terminated by Magnus even if Marpat paid off the entire amount due for the purchase of a station. Additionally, plaintiffs produced testimony that termination of the "Franchise Sales Agreement" would make the entire amount due on the service stations payable in 60 days, but would not terminate the sub-lease and purchase obligation. Plaintiffs also asserted at trial that it is an industry-wide practice for branded oil companies to refuse to franchise jobbers or to finance branded stations if the franchisee still has a contract in force with another company. The Skelly-designed leases, considered in the context of the franchise agreements and the industry-wide "single distributorship" practice, allegedly violated Section 1 of the Sherman Act and Section 3 of the Clayton Act.

Plaintiffs assert that in 1970 Skelly refused to permit them to cancel the base leases

1. Marpat also owns the petroleum dispensing equipment, including tanks, pumps and air compressors, used by Magnus. The only stockholders, officers and directors of both corporations were Arthur P. Magnus and members of his immediate family.

2. The only product involved in this case is gasoline.

3. This agreement was superceded by new agreements on March 1, 1965, and March 1, 1966. The original agreement specified that the annual minimum quantity of gasoline to be purchased was 810,000 gallons, but this was reduced to 701,000 gallons in the 1966 agreement. The agreements specified that they were terminable by either party on 60 days' notice at the end of the five-year "primary term" or on any subsequent anniversary date of the agreements.

4. The "financing source" referred to was Skelly for one of the service stations and a bank for the other two.

and that Skelly terminated plaintiffs' distributorship on February 28, 1973, supposedly in furtherance of its then current desire to withdraw from marketing in Wisconsin. Plaintiffs charge that defendant's violations of the antitrust laws prevented them from distributing branded petroleum products of any other oil company. In addition to damages, plaintiffs sought declaratory and injunctive relief.

In March 1976, the district court denied defendant's pretrial motion for summary judgment based on the statute of limitations. In November 1976, after a ten-day trial, a jury awarded plaintiffs $185,000 in damages before trebling, and judgment was accordingly entered in plaintiffs' favor in the amount of $555,000, plus costs and reasonable attorney fees as provided in Section 4 of the Clayton Act.[5] Skelly's post-trial motions were denied in January 1978. In the accompanying opinion Judge Gordon held that the evidence could reasonably be interpreted to show that the three franchise sales agreements between Magnus and Skelly were implemented "so as to include a

condition with Magnus not dealing in the gasoline of other suppliers" in violation of the exclusive dealing prohibition contained in Section 3 of the Clayton Act.[6] The district judge pointed out that the jury could have concluded that numerous other jobbers in the relevant market[7] were parties to financing arrangements with Skelly and were precluded from becoming jobbers for other suppliers, thus showing at least a potential lessening of competition under Section 3.

The district court also concluded that there was ample evidence from which the jury could have found that (1) the object of the financing arrangements between Skelly and its jobbers in that area was to restrain trade and (2) those arrangements revealed Skelly's anti-competitive intent in violation of Section 1 of the Sherman Act.[8]

In addition, the court concluded that plaintiffs had shown that they were injured in their "business or property" within the meaning of Section 4 of the Clayton Act[9] because Magnus had demonstrated an attempt to purchase the Jackson Oil Company

5. On February 1, 1978, plaintiffs filed a motion for determination of a reasonable attorney's fee for their counsel. The motion was supported by affidavits and a memorandum. Attorney's fees of $45,000 were subsequently awarded, so that the total judgment (stayed during this appeal) for plaintiffs is $600,400 plus costs. The record does not reveal that plaintiffs obtained any additional relief.

6. Section 3 of the Clayton Act provides in pertinent part:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods * * * or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods * * of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce" (15 U.S.C. § 14).

7. The judge noted that there were three different definitions offered of the relevant market. Defendant's expert focused on the 13-county area in southeastern Wisconsin where Magnus purchased gasoline and estimated that Magnus'

requirements comprised only .07 to .18 of 1% of that market. A Skelly field representative called as a witness for plaintiffs testified that in the "northern region" of Skelly's distribution system, which includes Wisconsin, there were approximately 40 to 50 financing programs with jobbers similar to the ones with Magnus. In discussing the relevant market, Judge Gordon also referred to testimony about Skelly's finance arrangements *in general*. See 446 F.Supp. at 879.

8. Section 1 of the Sherman Act provides in relevant part that

"[e]very contract * * * in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal" (15 U.S.C. § 1).

9. Section 4 of the Clayton Act provides:

"Any person who shall be injured in his *business or property* by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee" (15 U.S.C. § 15; emphasis supplied).

in Oshkosh, Wisconsin, and to become a Sunray DX franchisee in Oshkosh and Fond du Lac, Wisconsin, but was precluded from doing so by operation of the financing agreements between Magnus and Skelly.

Judge Gordon next found that there was sufficient evidence to support the jury's conclusion that Skelly's actions caused Magnus to lose the Jackson Oil and Sun franchise opportunities.

The district court decided that Magnus' evidence of damages because of its failure to acquire the Jackson Oil Company and to become a Sun franchisee was sufficient and that plaintiffs were not damaged until they were unable to obtain the Jackson Oil Company or a Sun franchise agreement in 1970, well within the four-year statute of limitations contained in Section 4B of the Clayton Act (15 U.S.C. § 15b).

Finally, the district court rejected Skelly's arguments with respect to the instructions and held that a one-month continuance between the close of the evidence and the final arguments did not require a new trial. 446 F.Supp. 874 (E.D. Wis. 1978). Defendant here appeals each of the district court's rulings except those relating to the statute of limitations, the instructions, and the continuance. We reverse.

## I. *No Violation of Section 3 of the Clayton Act*

This part of·our opinion will assume *arguendo* that the franchise sales agreements

between the parties tended substantially to foreclose competition in the relevant market.[10] Section 3 of the Clayton Act (note 6 *supra*) proscribes sales "on the condition, agreement or understanding" that the purchaser shall not deal in the goods of a competitor of the seller if its effect may be substantially to lessen competition. Plaintiffs contend that the three franchise sales agreements between them and Skelly violated this statute.

The first two agreements required plaintiffs to purchase 810,000 gallons of gasoline annually. In the third agreement, dated March 1, 1966, this amount was reduced to 701,000 gallons. None of the agreements contained an exclusive dealing clause nor required plaintiffs to purchase their total requirements of gasoline from Skelly, nor indeed any gallonage approaching plaintiffs' requirements.[11] The last of these agreements was terminated by defendant effective on February 28, 1971, although Skelly continued to supply Magnus on a month-to-month basis until February 1973.[12] During the years 1964–1971 plaintiffs never purchased anything approaching their requirements from defendant.[13] Because the agreements contained no exclusive dealing clause and did not require plaintiffs to purchase any amounts of gasoline that even approached their requirements, they did not violate Section 3 of the

10. But see Part II *infra.*

11. There was testimony that the 810,000 gallon minimum specified in the 1964 and 1965 agreements was intended to approximate Magnus' requirements. However, as described in note 13 *infra*, the minimum was reduced in subsequent years while Magnus' requirements had increased, and even in 1964 and 1965 less than two-thirds of Magnus' requirements were purchased from Skelly. In light of these facts, the possibility that the originally specified minimum amounts may have been intended to cover Magnus' requirements is insufficient to form the basis of a Clayton Act Section 3 claim, especially since the damage complained of did not occur until 1970–1971.

12. Subsequent to the February 1973 termination of their relationship, Skelly continued to

supply Magnus with gasoline under the federal voluntary and mandatory allocation programs.

13. As noted, in 1964 and 1965, the franchise sales agreement required plaintiffs to buy 810,000 gallons of gasoline from Skelly. Nevertheless, in the former year, Magnus bought 840,000 gallons of gasoline but only 568,000 gallons from Skelly. In 1965, plaintiff bought 1,057,000 gallons of gasoline but only 699,000 from Skelly. In 1966 through 1971, plaintiffs were obligated to buy 701,000 gallons per year from Skelly. In each of those years, plaintiffs' total requirements were about 1,000,000 gallons, a large percentage of which was purchased from other suppliers, ranging from 304,000 gallons in 1966 to 566,000 in 1971 (App. 79). Plaintiffs do not claim that the minimum 100,000 gallons per year per financed station to be purchased from Skelly violated the Clayton Act.

Clayton Act. See *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580; *Standard Oil Co. v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371.

While their course of conduct might evince that the parties were violating Section 3 of the Clayton Act, the evidence here contravenes such a course of conduct because the quantity specified in the agreements amounted to less than 60–80 per cent of plaintiffs' total requirements and plaintiffs regularly purchased 30–50 per cent of their requirements from competitors of the seller. Therefore, no illegal course of conduct has been shown under Section 3 of the Clayton Act. *McElhenney Co. v. Western Auto Supply Co.*, 269 F.2d 332, 338 (4th Cir. 1959). Here Skelly cancelled its last franchise sales agreement on December 28, 1970, effective on February 28, 1971, without any proof that it was selling plaintiffs their total requirements.[14]

Although plaintiffs persuaded defendant to reinstate the franchise contract on a month-to-month basis, defendant gave plaintiffs another notice of termination February 28, 1973, because of severe credit problems with plaintiffs even though for the first time plaintiffs had been purchasing virtually their total requirements in 1972 from Skelly. The fact that plaintiffs did buy gasoline only from defendant in 1972 does not further their cause, for their lawsuit is predicated on their 1970–1971

inability to become a Sun distributor and to purchase Jackson Oil Company.[15]

In sum, during the critical years plaintiffs were handling competitors' gasoline rather than purchasing exclusively from defendant and indeed the franchise sales agreements permitted this, so that Section 3 of the Clayton Act was not violated. *McElhenney Co. v. Western Auto Supply Co.*, *supra*, 269 F.2d at 338; *Davis v. Marathon Oil Co.*, 528 F.2d 395 (6th Cir. 1975).

## II. *No Showing of Tendency to Substantially Foreclose Competition in Relevant Market Under Section 3 of Clayton Act*

■ Even if the franchise sales agreements violated the forepart of Section 3 of the Clayton Act, they would not be illegal unless they tended to substantially foreclose competition between Skelly and its competitors in the relevant market. *Tampa Electric Co. v. Nashville Coal Co.*, *supra*, 365 U.S. at 334, 81 S.Ct. 623; *Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163, 1172 (7th Cir. 1978). As seen on their face and in practice, they did not substantially foreclose competition because in the key years plaintiffs bought large quantities of gasoline from other suppliers. In addition, by plaintiffs' own evidence the retail gasoline market in Sheboygan was highly competitive during the years in question, experiencing numerous "price wars." This suggests that Skelly's competitors were not foreclosed significantly from the retail market in She-

---

14. Some of the reasons for the cancellation were plaintiffs' delinquent payments and their purchase of less than 40 per cent of their gasoline requirements from Skelly, causing an oversupply situation at Skelly's Granville, Wisconsin, terminal.

15. After the 1971 termination of the agreement, Skelly supplied Magnus on a month-to-month basis and only for cash in advance. Plaintiffs' theory is that this action by Skelly, taken together with the fact that Magnus purchased 99.6% of its 1972 requirements from Skelly, reveals that the agreements were intended to be exclusive dealing contracts and that they were enforced by Skelly through the threat of cancelling the franchise, which would make the service station debts payable immediately. Plaintiffs assert that the fact that the agree-

ments were not strictly enforced in prior years does not relieve them of their illegality, citing *Advance Business Systems and Supply Company v. SCM Corporation*, 415 F.2d 55 (4th Cir. 1969). However, we think the events of 1972 do not support an inference that the agreements in force during the relevant years were exclusive dealing contracts in the absence of any evidence that the parties so understood them at the time. It would seem especially anomalous that Skelly should terminate the relationship entirely in February 1973 immediately after it had accomplished its asserted goal of requiring Magnus to purchase virtually exclusively from Skelly. Its action in doing so supports the inference that both the 1973 and 1971 terminations were on account of plaintiffs' credit difficulties.

boygan.[16]  Defendant put on evidence that the retail gasoline market in Wisconsin became more competitive between 1964–1974, with Skelly's share decreasing slightly between 1964–1971.[17]  Finally, the plaintiffs failed to show and the district judge did not define what the relevant market consisted of.  Thus the trial court, without selecting any, referred to three possible relevant markets:  (1) the 13-county area in southeastern Wisconsin where plaintiffs bought their gasoline;  (2) the northern region of defendant's distribution system;  and (3) defendant's entire sales area (note 7 *supra*).

The district court did not require plaintiffs to define the relevant market because it took out of context a statement in *Lessig v. Tidewater Oil Co.*, 327 F.2d 459, 468 (9th Cir. 1964), certiorari denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046, that the requisite substantial lessening of competition "may appear from facts other than the proportion of total commerce in the relevant market which is subject to restraint."  But in *Lessig* plaintiff established that the relevant market consisted of eight Western states, that the defendant sold 6.5% of the gasoline in that market, and that through the challenged exclusive dealing contracts the defendant controlled 5% of the retail gasoline sales in the market.[18]  *Tampa Electric, supra,* and *L. G. Balfour Co. v. Federal Trade Commission,* 442 F.2d 1 (7th Cir. 1971), clearly hold that the relevant market must be established in a case based on Section 3 of the Clayton Act.

On appeal, plaintiffs have pursued their arguments with regard to three different markets, but we find the evidence insufficient to support an inference that competition among Skelly's competitors could have been significantly impaired in any of them.  First, plaintiffs assert that in the "northern region" of Skelly's distribution system "Skelly jobbers numbered between 140 and 150, among whom there were 40 to 50 separate such lease/sub-lease arrangements" (Br. 19).  This is insufficient to show potential market foreclosure for at least three reasons:  (1) there is no description of what area comprises the northern region and why that is the relevant market, (2) since one jobber may have more than one financing agreement,[19] plaintiffs' statistics tell us nothing about what proportion of the job-

---

**16.**  When discussing the local market, plaintiffs sometimes seem to suggest that the important measure is the extent to which Skelly's competitors were foreclosed from distributing to Skelly jobbers, whereas at other times they focus on foreclosure of these competitors at the retail level.  Since jobbers are independent wholesalers, and since there appears to have been no significant foreclosure of competition at the local retail level, it seems that either there was no significant foreclosure in the relevant geographic market at the jobber level or that there were alternative means of distribution available.  At least, this is what we must conclude in the absence of evidence to the contrary.

**17.**  Plaintiffs' counsel sometimes appeared to be suggesting that an exclusive dealing contract could be illegal under Section 3 of the Clayton Act simply because it foreclosed the purchaser's ability to seek out competing sellers, without any showing of a possibility of a significant foreclosure of competition among the competitors of the seller.  To the extent this theory is applied to the franchise sales agreements, it is not supported by the evidence.  As already described, Magnus' freedom to purchase from other suppliers was not drastically curtailed.

However, plaintiffs also contend that the combination of the franchise sales agreements, the financing agreements, and the industry practice of sole distributorships curtailed its freedom to change distributors for the duration of the 15-year term of the financing agreements.  While such a deprivation of a purchaser's freedom apparently will confer standing on him to sue under Section 3 of the Clayton Act, the case law is clear that to recover he must show a potential foreclosure of competition to the competitors of the seller *Standard Oil Company v. United States; Tampa Electric Co. v. Nashville Coal Co.,* both *supra.*  This plaintiffs have failed to do.

**18.**  The *Lessig* court noted that the only evidence not available was what percentage of retail outlets in the market were subject to the exclusive dealing contracts.  It concluded that the more relevant figure was the portion of retail gasoline sales (in gallonage terms) which was subject to the challenged agreements.  Thus the relevant market information was before the *Lessig* court.

**19.**  Plaintiffs, of course, had three such agreements, and some jobbers apparently had as many as 8 or 10 financing agreements with Skelly.

bers or what proportion of the retail outlets were assertedly prevented from seeking other suppliers, and (3) there is no evidence of what Skelly's share of the relevant market was, so that even if it were possible to ascertain the proportion of Skelly outlets that were foreclosed,[20] it would still have been impossible to evaluate the impact of the foreclosure of those outlets on Skelly's competitors.[21]

Second, plaintiffs allege that the restrictive agreements complained of are company-wide and industry-wide, thus supporting an inference that collectively they must have foreclosed competition. The evidence of company-wide policy was that of 760–800 Skelly jobbers nation-wide, approximately 200 were estimated to have Skelly financing agreements. It was impossible to estimate the amount of Skelly gasoline sold through Skelly-financed stations.[22] Since we have already concluded that plaintiffs failed to establish that the franchise agreements precluded jobbers from purchasing from Skelly's competitors, the only remaining question would be whether, as plaintiffs allege, the inability of jobber-retailers to change distributors because of the financing agreements potentially foreclosed competition significantly. To determine that, however, we would need to know the proportion of

retail gasoline sales foreclosed by the Skelly financing agreements.[23] Plaintiffs failed to introduce such evidence, and the inferences that could be drawn from the statistics that are in evidence suggest that the impact on Skelly's competitors would be negligible. With regard to industry-wide practice, plaintiffs introduced testimony that many branded gasoline distributors had financing programs and single-distributor policies similar to Skelly's. However, none of the evidence offered, including that excluded by the district court, purported to establish the share of the gasoline sales foreclosed by such arrangements.[24] There simply were no facts from which a potential foreclosure of a significant amount of competition could be inferred from the evidence of company-wide or industry-wide practice.

The third market plaintiffs describe is the greater Sheboygan area. Plaintiffs were the third largest of twelve jobbers in the greater Sheboygan area and supplied 10 of the 88 service stations in that area. Even if, as plaintiffs insist, the relevant market for retail gasoline sales is the "community," it does not follow that the "community" is the relevant market to ascertain foreclosure of Skelly's competitors (many of whom were regional or national brands).[25] In ad-

**20.** Plaintiffs appear to assume that it is sufficient to show that the amount of market foreclosure was substantial in absolute terms. However, *Tampa Electric Company*, 365 U.S. 320, 329, 81 S.Ct. 623, 5 L.Ed.2d 580, made it clear that substantiality must be assessed on a comparative basis.

**21.** Defendant introduced evidence tending to show that any foreclosure of its competitors would be *de minimis*. Skelly had about 0.60% to 0.71% of the national market for gasoline in the relevant years. It distributed its gasoline in 17 states, and its portion of the market in each of these states in 1971 ranged from 1.24% (Illinois) to 6.47% (Kansas). It had approximately 2% of the Wisconsin market during the relevant years.

**22.** The gasoline purchased by Skelly jobbers who participated in the financing program was sold not just to the financed stations, but also "through commercial accounts, industrial accounts, through service stations that [they do] not own, for bulk plants, to farm accounts, et cetera, et cetera" (Tr. 653).

**23.** This would presumably be less than the amount of gasoline sold by Skelly-financed stations, since plaintiffs' agreements, for example, committed them to selling 100,000 gallons of Skelly gasoline through each station, whereas the requirements of each were approximately 120,000 gallons per station. Assertedly plaintiffs' agreement was typical, so that one could estimate that approximately 80% of retail sales of Skelly-financed stations were, according to plaintiffs' theory, foreclosed to Skelly's competitors.

**24.** In this respect the evidence falls far short of that in *Standard Oil Company v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371, where it was established that the defendant controlled 6.7% of the relevant market through exclusive dealing contracts and that its six leading competitors controlled 42.5% of the market through similar contracts.

**25.** Nor does it follow that foreclosure from part or all of plaintiffs' business could substantially impair the competitive position of Skelly's competitors. See note 16, *supra*.

dition, the evidence does not establish that Skelly's competitors were foreclosed even from the greater Sheboygan area since (1) as indicated, plaintiffs bought a significant portion of their requirements from Skelly's competitors, (2) only three of the ten stations supplied by plaintiffs were subject to the financing agreements, and (3) there was evidence of vigorous inter-brand competition in Sheboygan. Thus none of plaintiffs' theories of possible competitive foreclosure is supported in the record.

The defendant's evidence did show that the 13-county area within a 62-mile radius from Sheboygan was the relevant market and that plaintiffs had less than 1% of that market in each of the years involved, so that the franchise sales and financing agreements would at most foreclose a *de minimis* volume of competition. That would not suffice to activate Section 3 of the Clayton Act. *Tampa Electric Co., supra*, 365 U.S. at 333–335, 81 S.Ct. 623.

III. *No Violation of Section 1 of the Sherman Act*

■ The complaint in this case does not make any charges that would amount to a *per se* violation of Section 1 of the Sherman Act, and the Supreme Court's recent decision in *Continental TV, Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568, evinces judicial reluctance to extend *per se* rules under that statute. Therefore, these plaintiffs had the burden of showing that any arrangements between plaintiffs and defendant unreasonably restrained trade. We conclude that plaintiffs have not satisfied the rule-of-reason standard that governs here.

■ The district court held that Section 1 of the Sherman Act was violated by defendant because the jury could have concluded that the object of the financing arrangements between the parties was to restrain trade. 446 F.Supp. at 880. We cannot agree because the financing arrangements

covering the three stations only required them to purchase 100,000 gallons of gasoline annually from defendant. These amounts were *de minimis* in view of plaintiffs' total requirements for gasoline. See note 13 *supra*. Even if the financing agreements were a means of preventing plaintiffs from cancelling the franchise agreements, they would still have to show that the foreclosure of the amounts specified in the franchise agreements constituted an unreasonable restraint of trade. Just as there was no showing of a potentially substantial adverse effect on competition under Section 3 of the Clayton Act, the requisite evidence to show that under Section 1 of the Sherman Act the effect upon competition in the market-place was substantially adverse is also fatally lacking. See *Lee Klinger Volkswagen v. Chrysler Corp.*, 583 F.2d 910, 914–915 n. 6 (7th Cir. 1978).

As shown earlier, the district court did not determine the relevant market although defendant's expert witness testified that it consisted of the 13 counties within 62 miles of Sheboygan. He testified that even if that market were halved and even if all plaintiffs' requirements for gasoline were foreclosed by defendant to its competitors, the effect would still be less than 1% of the market. This means that defendant's arrangements must be considered reasonable under Section 1 of the Sherman Act. *United States v. Columbia Steel Co.*, 334 U.S. 495, 508, 511, 68 S.Ct. 1107, 92 L.Ed. 1533; *Tampa Electric v. Nashville Coal Co.*, 365 U.S. 320, 334–335, 81 S.Ct. 623, 5 L.Ed.2d 580.[26] As discussed at length *supra*, plaintiffs have presented no credible evidence of an adverse effect on competition. Because plaintiffs failed to show that defendant's financing arrangements substantially foreclosed its competitors in a relevant market, no unreasonable restraints have been demonstrated.

■ Since plaintiffs have not proven that defendant violated Section 3 of the Clayton

---

**26.** Plaintiffs' witness, Dr. Allvine, testified in the abstract that defendant's arrangements were unreasonable, but his testimony was without reference to any relevant market and

therefore was insufficient to show a violation of Section 1 of the Sherman Act. *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230 (3d Cir. 1975).

Act or Section 1 of the Sherman Act, we need not consider whether they have failed to show that they were injured because of a violation of the antitrust laws and whether their claimed damages were too speculative to support the judgment. The district court's judgment is reversed with directions to enter judgment for defendant notwithstanding the verdict.[27]

---

**27.** Our holding is not based on the absence of evidence on the details of exclusive dealing arrangements of Skelly's competitors. And even if the district court should have considered defendant's competitive price allowance program (the giving of price rebates on gasoline sold to a jobber who had been forced by retail price wars to reduce his sale price), that pricing formula has not been shown to violate Section 3 of the Clayton Act. Therefore plaintiffs' cross-appeal is dismissed.